**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Larry Green,

    Plaintiff,

    v.                                      Case No. 1:07cv109

Fidelity Investments,                        Judge Michael R. Barrett

    Defendant.

## OPINION & ORDER

This matter is before the Court upon Defendant Fidelity Investment's Motion for Summary Judgment. (Doc. 24) Plaintiff Larry Green has filed a Response in Opposition (Doc. 39) and Defendant has filed a Reply (Doc. 44)

### I.   BACKGROUND

On September 14, 1999, Plaintiff Larry Green began working for Defendant Fidelity Investments ("Fidelity") as a financial service representative. (Doc. 33, Larry Green Depo. at 47) At that time, Green signed an Employee Agreement acknowledging that his employment was at-will. (Id., Ex. 5) While employed at Fidelity, Green became licensed by the National Association of Securities Dealers ("NASD"). (Id. at 51-52)

In May of 2005, Green transferred to Fidelity's Investments Department to work as an Investment Representative ("IR"). (Id.) As an IR, Green answered calls from current and potential customers to assist them with their financial needs, and refer them to other Fidelity departments. (Id. at 101) Green was required to "qualify" potential customers to determine which Fidelity products and services were suitable. (Id. at 187-88) To properly qualify a caller, an IR must ask each caller a series of pre-determined questions. (Id.)

When an IR determines that a caller is qualified for a particular product or service, the IR marks a "lead" in the caller's account. (Id. at 189-90) A lead identifies the specific product or service for which a caller is qualified and may be interested. (Id. at187-88) Based on the type of lead designated, a Fidelity business partner who specializes in that product or service will then contact the caller to provide additional information and attempt to complete the transaction. (Id. at 187-88) IRs are evaluated, in part, on the number and quality of leads they generate. (Id., Exs. 17-21). IRs receive monetary incentives such as bonuses, trips and other awards based on their lead volume. (Id. at 71, 196-97)

As an IR, Green produced a high lead volume. (Id., Ex. 17) Green won several sales campaigns and trips, including one to Las Vegas. (Id., Exs, 20, 21; Rulli Depo. 93, 96) Green also won several awards for customer service. (Doc. 39-2, Larry Green Decl., Ex. 1)

However, Green was also disciplined several times. In July of 2000, Green's supervisor at the time, Todd Kollman, placed him on corrective action for repeatedly violating the company's break policy. (Green Depo. at 63; Ex. 6) In January of 2001, Green's supervisor, Dawn Brewer, issued him a "Final Written Warning" for improperly taking credit for leads. Brewer wrote: "Such inappropriate coding of calls will not be permitted . . . . Improper coding, and ultimately receiving and taking credit for leads not transferred to the Investments department . . . is unacceptable." (Id. at 71; Ex. 8) Brewer also stated: "This warning will remain in effect for the duration of your employment with Fidelity Investments." (Id.) In June of 2003, Green's supervisor at the time, Andrew Ritter, issued him another Final Written Warning for providing confidential account information to a caller whose identity he did not verify. (Id., Ex. 11) In August of 2004, Green's

supervisor, Scot Herrmann, issued him a ninety-day warning for excessive trading errors. (Id., Ex. 14)  In March of 2005, Green was placed on probation for continued excessive trading errors. (Id.)

In March of 2006, Rulli attended a training session for team managers designed to improve employee performance. (Doc, 43, Dina Rulli Depo. at 111-13, 118) Rulli and the managers listened to a call handled by Green and questioned whether he had taken credit for a lead without qualifying the customer. (Id. at 114-15)

Rulli met with Green and played the call for him. (Green Depo. at 214-15) Green admitted that he had not discussed the criteria required to enter and obtain credit for the lead. (Id. at 216)[1] Rulli informed Green that she planned to review more of his calls, and she asked whether she would find other such calls. (Id. at 218) Green assured Rulli that she would not. (Id.)

After meeting with Rulli, Green reviewed his notes from the call. (Id. at 219) Green recalled that he had been told that the best way to communicate with the Income Planning department was through a lead. (Id. at 223-224, 229-230) Green wanted to be sure that the proper person from the department contacted the customer. (Id. at 230-231) Green

---

[1]In his deposition, Green testified:

Q: And then you agreed with her in this meeting that you should not have taken credit for a lead, correct?

A: I shouldn't have checked the box.

Q: And by checking the lead box, that was one of the leads that then goes into your incentives statistics. Right?

A: Right. That would have gone there.

(Green Depo. at 216)

approached Rulli and told her that she could delete the lead from his total. (Id. at 227, 235)

When Rulli reviewed a sampling of Green's calls from March 2006, she found that Green had falsified leads for at least six other calls during that month. (Rulli Depo. at 128-29) Rulli did not speak to Green about these calls. (Id. at 142-43) Instead, Rulli sent an email to her supervisor, Mary Svitkovich, and a human resources representative, Heidi Fortune explaining that:

> It was discovered that Larry Green has been inappropriately submitting leads, therefore obtaining credit for work not performed. Leads were submitted for business partners in Annuities, PAS (Portfolio Advisory Services), and Income Planning in instances where these products and services were never discussed with clients. This behavior is a manipulation of the systems to receive credit for work that was not completed. This does have an impact on review scores, quarterly bonuses, and campaign awards. This is a clear violation of our policies and procedures.

(Svitkovich Depo. Ex. 1) Rulli, Fortune and Svitkovich agreed that Green should be terminated for violating Fidelity policy. (Rulli Depo. 145, 148) On March 27, 2006, Rulli met with Green and informed him that his employment was being terminated because he inappropriately submitted a lead. (Green Depo. at 237, 241; Rulli Depo. 147-48) Green was 52 years-old at the time.

Under federal securities law, Fidelity was required to submit a Form U5 to NASD within thirty days of Green's termination. (Doc. 24, Ex. 1) Form U5 requires Fidelity to explain why the individual's registration is being terminated, and then verify the accuracy and completeness of the information. (Green Depo., Ex. 24) Fidelity provided the following reason for terminating Green: "[E]mployee violated department procedures by recording leads to business partners when he did not have the requisite substantive conversations with the customers." (Doc. 24, Ex. 2)

In his Amended Complaint, Green claims age discrimination under the Age Discrimination in Employment Act ("ADEA") and Ohio Revised Code § 4112.02(A). Green also brings claims of breach of implied contract, defamation, and interference with prospective employment under Ohio law.

## II. ANALYSIS

### A. Motion for Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

Moreover, this Court does not have a duty to search the entire record to establish that there is no material issue of fact. *Karnes v. Runyon*, 912 F.Supp. 280, 283 (S.D.Ohio 1995); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80 (6th Cir. 1989). The non-moving party must designate those portions of the record with enough specificity that

the Court can readily identify those facts upon which the non-moving party relies. *Karnes*, 912 F.Supp. at 283.

## B. ADEA

The Age Discrimination in Employment Act ("ADEA") prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). The *McDonnell Douglas* burden-shifting framework for circumstantial-evidence cases has been applied in the context of claims brought under the ADEA. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).

In order to establish a *prima facie* case of age discrimination, a plaintiff must show that: (1) he or she is a member of the protected class, that is, he or she is at least forty years of age; (2) he or she was subjected to an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was treated differently from similarly situated employees outside the protected class. *Mitchell v. Vanderbilt University*, 389 F.3d 177, 181 (6th Cir. 2004). In this case, the parties only dispute whether Green has shown the fourth element.

Green does not point to a similarly situated employee, but instead argues that this Court should take a flexible approach to the *McDonnell Douglas* test. Specifically, Green argues that the Court should find that he has satisfied the fourth element by showing that Rulli disfavored older workers. Green relies on the testimony of Debbie Collins, who was also fired by Rulli. (Rulli Depo. at 106) Collins explains that she took a call from a client who wanted information which was available on-line. (Doc. 39-2, Debbie Collins Decl. ¶ 7) Collins used the client's password to access the information, which was improper. (Id.)

Collins admits that she had been given a warning in August of 2005, but could not believe she was being fired for helping a client. (Id.) Collins was forty-eight years old at the time of her termination. (Id., ¶ 2)

Green also cites to the testimony of Collins and Bill Harland, another employee who was sixty years old at the time, who state that Rulli did not want to be around the older employees and assigned the older employees to desks further away from her. (Collins Decl. ¶ 8-9; Doc. 30, William Harland Depo. at 6, 12) In his deposition, Green stated that at one social function, Rulli chose to sit with the younger employees. (Green Depo. at 170-72) Green also testified that Rulli spent more time coaching younger employees. (Id. at 160-61; 178-79)

The Sixth Circuit has recognized that there may be cases where there is so much circumstantial evidence of discriminatory animus that the plaintiff's failure to establish the fourth element is not fatal to a Title VII claim. *See Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 166 (6th Cir. 2004). The evidence must "tend to eliminate the most common non-discriminatory reasons" for the adverse action and "raise an inference that the adverse action was motivated by discriminatory animus." *Id.* at 166-67.

In *Birch*, the plaintiff was employed as a probate court magistrate. *Id.* at 155. A study conducted of the magistrates' salaries showed that the average salary of the female probate court magistrates was lower than the average salary of the male magistrates. *Id.* at 155-56. The plaintiff, along with three other female magistrates, met with the presiding judge to discuss their concerns about their low salaries. *Id.* at 156. The judge stated that certain departments of the probate court had more responsibility and therefore justified higher salaries. *Id.* The judge also allegedly stated, "I don't know how I would make these

salaries fair. I rely on the men to do the important work of the Court." *Id.* The plaintiff asked the judge whether he had a concern about her work, to which the judge replied that he did not "trust her work" and he "would prefer that [she] not work here." *Id.* When the plaintiff asked if she was fired, the judge responded no. *Id.* The judge also allegedly stated, "I don't have to hire women," and explained that if the female magistrates did not want to work at the court, they do not have to do so. *Id.*

The Sixth Circuit found that under Ohio law, this evidence was direct evidence of discrimination. *Id.* at 165. The court explained that the judge's statements "constitute highly probative evidence of sexual bias by the individual most familiar with and responsible for setting the magistrate's salaries, a bias that he expressed in the context of [the plaintiff's] complaint about being underpaid." *Id.* The court found that "there was a direct correlation between [the judge's] sexual animus and his refusal to increase [the plaintiff's] pay." *Id.* The court went on to find that even if the evidence was not direct evidence of discrimination, the evidence was sufficient circumstantial evidence to satisfy the plaintiff's burden under *McDonnell Douglas*. *Id.* at 167.

The Court finds that the evidence presented by Green does not compare to the highly probative evidence of bias submitted by the plaintiff in *Birch*. *Accord Tribble v. Memphis City Schools*, 193 Fed.Appx. 401, 408 (6th Cir. Aug. 21, 2006) (unpublished) (finding that the plaintiff failed to offer evidence which is "analogous to the rampant hostility the Court considered in *Birch*.") Green has not presented any statements by Rulli which refer to the age of any employee or otherwise indicate a discriminatory animus based on age. Moreover, the evidence presented by Green does not "tend to eliminate the most

common non-discriminatory reasons" for his termination or the firing of Collins. Both Green and Collins admitted that they had done what they had been accused of, and also recognized that they had previously been given warnings about their work. The Court notes that at the social function identified by Green, Rulli did not chose to sit with the younger employees, but instead sat in the middle of the table and was then surrounded by the employees.[2] In addition, Green's own testimony contradicts the statements made by Collins and Harland that Rulli positioned her desk near those of the younger employees. Green testified that he did not know whether Rulli assigned him a desk or picked his own, but when Collins left, Green "just moved over to her desk." (Green Depo. at 138) Therefore, this evidence does not "raise an inference that the adverse action was motivated by discriminatory animus." Accordingly, the Court finds that Green has not presented sufficient evidence to support a *prima facie* case of age discrimination.

Even if the Court were to find that Green has shown a *prima face* case, the Court finds that Green has not shown that Fidelity's articulated reason for his termination is pretextual. A plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action. *Manzer v.*

---

[2]In his deposition, Green testified as follows:

Q: Well, you said that she had placed herself away from you.

A: No. I said she went in and she sat down. We had a long table against the wall. And she went in and sat down at it, and all these guys came in and filled in around her. And then we sat down clear at the other end where there were three seats left.

(Green Depo. at 172)

*Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Green argues that Fidelity's reason is insufficient because even though he had been issued a final written warning in 2001, he had been counseled for performance issues at least three times after his warning and not been fired. The Court is unable to conclude that based on Fidelity's willingness to give Green multiple opportunities to "try again," Fidelity's reason for finally terminating him is pretext for discrimination. In the absence of any evidence of discriminatory animus in this case, the decision to terminate him could very well be based on a culmination of infractions–the proverbial "straw that broke the camel's back."

The Court is also not persuaded by Green's attempt to cast doubt on Fidelity's reason for his termination by arguing that there were no complaints about Green submitting leads which resulted in calls to clients or potential customers who were not interested in the products or services. There is no evidence in the record that there was any mechanism by which such complaints would be reported. Moreover, just because Green's practice of submitting leads without first qualifying the caller was not detected for a period of time does not mean that it did not occur or was acceptable.

The Court also rejects Green's argument that it was a departure from Fidelity's policy or practice to review calls which pre-dated his counseling or to not allow him to listen to the additional calls. There is nothing in the record which shows that Fidelity had a policy in this regard or had treated other employees differently.

Finally, Green attempts to compare himself to Harland, who was not terminated for improperly submitting a lead. However, Harland, unlike Green, had never been disciplined. (Rulli Depo. at 83)

Based on the foregoing, the Court finds that Fidelity is entitled to summary judgment

on Green's claim of discrimination under the ADEA.

### C. Discrimination under Ohio law

This Court has found that cases interpreting the ADEA are applicable in the analysis of claims of age discrimination under Ohio law. *Williams v. General Elec. Co.*, 269 F.Supp.2d 958, 966 (S.D. Ohio 2003), *citing*, *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998); *Cochran v. Columbia Gas of Ohio, Inc.*, 742 N.E.2d 734, 738 (Ohio 2000). Accordingly, the Court finds that Fidelity is entitled to summary judgment on Green's claim of discrimination pursuant to Ohio Revised Code § 4112.02(A).

### D. Breach of implied contract

Green argues that a practice of progressive discipline and firing employees only for good cause is sufficient to create an implied contract to terminate for just cause. However, not only did Green sign an agreement stating that his employment was at-will, but Fidelity's Corrective Action Policy expressly states that it "does not create a contract of employment" and that "certain conduct may warrant immediate termination." (Doc. 24-5)

In Ohio, "[a]bsent fraud in the inducement, a disclaimer in an employee handbook stating that employment is at will precludes an employment contract other than at will based upon the terms of the employee handbook." *Wing v. Anchor Media, Ltd. of Texas*, 570 N.E.2d 1095, 1098 (1991). Green has not shown any evidence of fraud in the inducement, and therefore he has not demonstrated that his claim should not be precluded by the disclaimer. *Accord Bickley v. FMC Technologies, Inc.*, 282 F.Supp.2d 631, 641 (N.D.Ohio 2003) (explaining that "even if defendant progressively disciplined three other

employees, as plaintiff argues, this alone cannot create the existence of an implied contract-especially with the express contractual disclaimer and reservation of rights in the employee handbook."). Accordingly, Fidelity is entitled to summary judgment on Green's claim of breach of implied contract.

E. **Defamation**

Under Ohio law, defamation is a false publication that injures a person's reputation. *Dale v. Ohio Civ. Serv. Emp. Assn.*, 567 N.E.2d 253, 258 (Ohio 1991). Accordingly, a defendant can defend against a defamation action by showing that "the imputation is substantially true, or as it is often put, to justify the 'gist,' the 'sting,' or the substantial truth of the defamation." *Nat'l Medic Srvs. Corp. v. E.W. Scripps Co.*, 573 N.E.2d 1148, 1150 (Ohio Ct. App. 1989).

On the Form U5 submitted by Fidelity, the reason provided for Green's termination is: "[E]mployee violated department procedures by recording leads to business partners when he did not have the requisite substantive conversations with the customers." While Green may deny any dishonest motive in designating leads without qualifying the caller, he does not deny doing so, or that this was the basis for his termination. Therefore, Green has not shown the falsity of the statement, and Fidelity is entitled to summary judgment on Green's claim for defamation.

F. **Interference with prospective employment**

Under Ohio law, tortuous interference with business relationships occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus Cent. Ohio Bldg. & Constr. Trades*

*Council*, 651 N.E.2d 1283, 1294 (Ohio 1995). Green claims that the negative comment on the Form U5 has interfered with potential employment. However, Green's only evidence is his own testimony that employers have refused to hire him because of the statement on the Form U5. Green does not identify the prospective employers or provide any documentation that he was rejected for employment based on the statement by Fidelity. Without more, Fidelity is entitled to summary judgment on Green's claim of interference with prospective employment.

### III. CONCLUSION

Based on the foregoing, Defendant Fidelity Investment's Motion for Summary Judgment (Doc. 24) is hereby **GRANTED**. This case shall be **CLOSED** and **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

                                           */s/ Michael R. Barrett*
                                           Michael R. Barrett, Judge
                                           United States District Court